# EXHIBIT B



## American Arbitration Association
## Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Case Number: 01-21-0017-1862

Robert Zeidman,
             Claimant,
v.
Lindell Management LLC,
             Respondent.
_____

## Reasoned Decision and Final Award

The undersigned Panel of Arbitrators ("Panel") have been designated in accordance with the arbitration clause in paragraph 9 of the parties' August 10, 2021, Agreement. An evidentiary hearing was held beginning on January 17 and concluding January 19, 2023, in Minneapolis, Minnesota before Arbitrators David Allgeyer, Gary Benton, and David Hashmall.  The parties submitted post-hearing briefs and arguments.

Brian Glasser, Cary Joshi, and Lori Bullock, Bailey & Glasser, LLP, appeared for Claimant.  Alec Beck and Andrew Parker, Parker Daniels & Kibort, LLC appeared for Respondent.

The Panel has determined pursuant to AAA Commercial Arbitration Rule R-46 (2013) that a Reasoned Award is appropriate in this case. Thus, having been duly sworn and heard the proof and allegations of the parties, the Panel makes the following Reasoned Decision and issues the following Final Award.

# Background

Claimant Robert Zeidman ("Mr. Zeidman") initiated this arbitration against Respondent Lindell Management LLC ("Lindell LLC"), claiming he won the Prove Mike Wrong Challenge contest ("the Contest") in August of 2021, entitling him to the contest prize of $5 million.  He also claims that, if the Contest rules are interpreted in the way Lindell LLC interprets them, they are unconscionable. Finally, he also claims that Lindell LLC violated the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69 (1988) by, among other things, creating a contest knowing it would not declare a winner and failing to provide 2020 election data as promised. Lindell LLC asserts that Mr. Zeidman simply failed to win the Contest under the Contest rules and denies any fraud.

### The Parties

Mr. Zeidman has a master's degree in electrical engineering, an undergraduate degree in physics, and over 45 years of experience in software development.  He holds over two dozen patents in computer software, hardware, communications, and similar fields.  He has served on many occasions as an expert witness in intellectual property cases involving computer software and hardware.

Lindell LLC is owned and operated by Michael Lindell ("Mr. Lindell").  Mr. Lindell is a Minnesota-based businessman and political activist.  He has been involved in issues involving election security and with litigation involving election security.

### The Symposium and Contest

2

Mr. Lindell claimed he possessed a great deal of data, which he was advised had been captured from the internet during voting in the November 20, 2020 U.S. election. He says he believes that the data shows that China had interfered with the November 2020 election in several states.

He repeatedly stated this belief in his appearances on news networks, internet news sources, and on his streaming channel, Frank Speech. Mr. Lindell readily conceded at the hearing he does not have the ability to analyze software data and says that he therefore relied on experts to analyze the data. He says the experts assured him that the data was real and proved China's interference with the election.

Mr. Lindell testified that he was frustrated that his statements about China's election interference were not being taken seriously, and so decided to hold a "Cyber Symposium." The purpose of the symposium was to provide the data he had to prove China's interference in the November 2020 election. He invited the press, politicians, and cyber experts to attend the symposium, which took place in Sioux Falls, South Dakota, on August 10 and 11, 2021.

Publications promoting the event said that he would reveal "cyber data and packet captures from the 2020 November election." These packet captures and data, he testified, are like watching a movie of the election data in real time. He said that, to cyber experts who understand how to read this data – much as someone can read a foreign language – this data proves interference with the election. Among other things, it includes time stamps and internet addresses of the sender and receiver

that can be checked by cyber experts to verify its authenticity.  In an interview in June of 2021, he said that "when we show them these packet captures, we're gonna just give them out to all them cyber guys so they can have their own guy go, 'How many votes were flipped here in Tampa?' Here you go. Boom."  He made other statements to the same effect.

As part of the Cyber Symposium, Lindell LLC also announced a contest called the "Prove Mike Wrong Challenge" ("the Contest").   The announcement said that the participants "have one goal.  Find proof that this cyber data is not valid data from the November Election. For the people who find the evidence, 5 million is their reward."

At the hearing, Mr. Lindell reiterated that the data he had was like a movie of the election data, if one knows how to translate it.  He further noted that it couldn't be altered without cyber experts being able to detect the alteration.  That, he testified, was the data to be presented at the Contest.

### Mr. Zeidman Enters the Contest

Mr. Zeidman learned of the Prove Mike Wrong Challenge.  He testified that he was interested in the claims that there had been interference in the 2020 election and wanted access to the data as promised to see "history in the making, perhaps to see an election overturned."   Mr. Zeidman told his friends that he was unlikely to win because Mr. Lindell would not offer a $5 million prize if Mr. Lindell had not had his own experts vet all the data to be presented.

He secured an invitation to the symposium, having been vetted by Lindell

LLC and its consultants as having the right credentials. Entering the Contest was free, so Mr. Zeidman decided to do so. To enter, participants were required to sign the Contest rules, which had been provided to Mr. Zeidman after he had traveled to Sioux Falls. He signed the rules.

*The Contest Rules*

The challenge presented by the Contest rules was, essentially, to prove the data presented was not "from the November 2020 election." Specifically, the rules provided:

> 1. Overview. Lindell Management, LLC. ("Lindell") has created a contest where participants will participate in a challenge to prove that the data Lindell provides, and represents reflects information from the November 2020 election, unequivocally does NOT reflect information related to the November 2020 election (the "Challenge") . . .

> 5. Participants must submit all of their evidence in writing to a three member panel selected by Lindell who will determine whether the submission proves to a 100% degree of certainty that the data shown at the Symposium is not reflective of November 2020 election data.

> 6. Winners. The winners will be determined on August12, 2021 by 8:00 pm CDT. The three-member panel selected by Lindell will identify the winners based on their professional opinion that the submission proves to a 100% degree of certainty that the data shown at the Symposium is not reflective of November 2020 election data. . . .

> 7.   . . .  In the event there is an alleged or actual ambiguity, discrepancy or inconsistency between disclosures or other statements contained in any Contest-related materials and/or these Official Rules (including any alleged discrepancy or inconsistency in these Official Rules), it will be resolved in Lindell's sole discretion. . . .

Thus, the rules provided that, to win the Contest, a participant must prove "that the data Lindell provides, and represents reflects information *from the November 2020 election*, unequivocally does NOT reflect information related to the November 2020 election . . . ," in one formulation. (Emphasis added.) In a later provision, the rules required that a participant provide a written submission that "proves to a 100% degree of certainty that the data shown at the Symposium is not reflective of **November 2020 election data**." (Emphasis added.)

The Contest rules focused on the authenticity of the data rather than on what the data did or did not prove about any interference by China. Per Lindell LLC, this was done because there were multiple terabytes of data, and it would take months to analyze and to come to conclusions about interference in the election. Mr. Lindell testified he was convinced by the cyber experts he hired that he could not lose the contest because the data he had been provided was genuine election data.

### *The Red Team Prepares the Data*

Lindell LLC assembled the Red Team, a group of software professionals, to review the data that would be presented to Contest participants. Members of the Red Team protested that the data was not at all what they expected. They had expected to be provided with packet capture data that could be examined and authenticated to evaluate whether the data files provided were genuine or had been tampered with or altered.

Packet capture data relates to the way computer networks send data. Data is sent in the form of packets. Packets are small packages of binary data, i.e. 1s and

0s.  They include information that acts like an envelope, specifying the IP address of the machine that sent the data, the IP address of the recipient, and the dates of sending and receipt.  Included within the packet is the content to be sent, analogous to the letter or other content in an envelope.  That could include text, pictures, or the like.  To facilitate network traffic, many packets must be sent for one message. These packets are then reassembled on the recipient's computer or other device according to information that accompanies the packet to facilitate reassembly.   The content may be encrypted.  If so, it must be decrypted.  The 1s and 0s must be translated for the data to be readable by humans.  Packet data is typically stored in PCAP format. Data that is extracted from the internet in real time would be expected to be in PCAP format.  This is so because, as Dr. Douglas Frank, a cyber expert relied on by Mr. Lindell and a Contest judge explained, "everything on the Internet is in packets. So when you capture it, it's a packet capture."

The alleged source of most or all the data Lindell LLC received and presented at the Contest was Dennis Montgomery.  Allegedly, Mr. Montgomery claimed to have captured the data from internet traffic using software tools called Hammer and Scorecard.

Josh Merritt, a member of the Red Team, explained that none of the Red Team cyber experts were able to open the files and obtain packets from the data Lindell LLC provided.[1]  Mr. Merritt, in fact, testified that he had advised Mr. Lindell to call

---

[1] There was testimony at the hearing that Mr. Merritt had hoped to win the Contest himself, although he was ineligible to enter because he was a member of the Red Team.  He was later directed to leave the Cyber Symposium because he was suspected of leaking information to

the Contest off. Mr. Douglas Gould, Lindell LLC's expert witness, who attended the Cyber Symposium, also expected to see packet captures.

Dr. Frank was not a member of the Red Team, but as previously mentioned, was a cyber expert relied on by Mr. Lindell and served as a Contest judge. He explained how the data was generally prepared for the Contest participants. First, he said, there was too much data to provide it all to participants. So, they were given a "slice" of the data. Second, he testified that he believed they needed to be sure to avoid providing sensitive private information, which could include passwords and sign-ins. That could be illegal. Third, he said that they put a "simple cipher" in place for at least one file to "separate the men from the boys." That is, to have participants demonstrate their "sleuthing" skills. Participants would have to find the cypher and de-cypher the data, thus demonstrating their skill. Fourth, some data was presented in encrypted form that apparently could be opened only using cExtractor, a software tool designed for that purpose. A video excerpt of someone using cExtractor was provided to participants, without explanation. cExtractor was not provided as part of the Contest data, although it may have been provided in a group of hundreds of files later given to participants by Mr. Merritt.

### Mr. Zeidman's Findings and Report

On the first day of the Contest, Mr. Zeidman was provided with seven files.

---

the press. Allegations of Mr. Merritt's wrongdoing, apparently presented to undermine Mr. Merritt's credibility, were all based on second-hand information. His testimony regarding the data expected is also consistent with the testimony of Todd Sanders, a Contest judge, and Mr. Gould, both of whom also expected packet data and were disappointed Lindell LLC did not provide such data.

It is unclear who created or named these files.  The files were:

    1. cExtract.mp4

    2. Chinese_SourceIP_HEX.txt

    3. Election Process Taxonomy.pdf

    4. FinalReult_2020_HEX.txt

    5. rnx-000001.bin

    6. Targets_HEX.txt

    7. Target_MachineID_HEX.tx

On the second day of the Contest, Mr. Zeidman was given four more files:

    1) mx-000123.csv

    2) Summary.rtf

    3) rnx-000002.bin

    4) rnx-000003.bin

After receiving and analyzing the files, Mr. Zeidman believed he would be able to win the Contest.  He wrote and presented a 15-page report explaining his conclusion that "the data Lindell provides, and represents reflects information from the November 2020 election, unequivocally does not contain packet data of any kind and do not contain any information related to the November 2020 election."   The report also contains exhibits of printouts and the like from the data in support of his conclusions.

### Judging the Report

As noted, the Contest rules provided that Contest winners would be

determined on August 12, 2021, by 8:00 pm CDT by a three-member panel selected by Lindell LLC.  The Contest panel consisted of Dr.  Frank, Mr. Sanders, and Kurt Olsen.   Dr. Frank and Mr. Sanders have educational, technical, and practical backgrounds relating to software security.  Mr. Olsen is Lindell LLC's attorney.  He says he wrote the Contest rules with input from cyber experts.  He was included in the Contest panel to provide a legal perspective.

Dr.  Frank and Mr. Sanders said they gave serious consideration to Mr. Zeidman's report, but concluded Mr. Zeidman had not won the Contest.  Dr. Frank authored a report sometime after the decision on the Contest, perhaps after Mr. Zeidman filed his arbitration demand.  Mr. Sanders provided notes on his decision, which were provided to Mr. Olsen and edited for submission.

Disappointed in the Contest panel's failure to declare him a winner and award him $5 million, Mr. Zeidman filed this arbitration.

## Discussion

### The Issues for Decision

The issues presented to the Panel for decision are narrow.  The first is whether Mr. Zeidman won the Prove Mike Wrong Challenge contest, so that Lindell LLC breached its contract with him by not paying him $ 5 million.  The second is whether the Contest rules were unconscionable.  The third is whether Lindell LLC violated the Minnesota Consumer Fraud Act by, among other things, creating a contest knowing it would not declare a winner and failing to provide 2020 election data as promised.

The Panel was not asked to decide whether China interfered in the 2020 election.  Nor was the Panel asked to decide whether Lindell LLC possessed data that proved such interference, or even whether Lindell LLC had election data in its possession.  The focus of the decision is on the 11 files provided to Mr. Zeidman in the context of the Contest rules.

### The Law

Minnesota law applies to the legal issues in this dispute.  Contest rules, ¶ 8

### A.  The Breach of Contract Claim

Contests and their rules are evaluated under general contract principles. *Rogalski v. Poker League*, No. A10-1067, at 3 – 4 (Minn. Ct. App. Feb. 22, 2011); *see Mooney v. Daily News Co.*, 116 Minn. 212 (Minn. 1911).  A contract was formed when Mr. Zeidman entered the Contest.  *See Rogalski,* No. A10-1067 at 4.

To succeed on his breach of contract claim, Mr. Zeidman must prove that (1) a contract was formed; (2) he performed any conditions precedent; and (3) Lindell LLC breached the contract. *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006).

### Interpretation of the Agreement / Contest rules

To decide whether Lindell LLC breached its agreement with Mr. Zeidman by not declaring him a Contest winner and paying him $5 million, the Panel must first interpret the terms of the contract contained in the Contest rules.  At issue are two key phrases: (1) "prove that the data Lindell provides, and represents reflects *information from the November 2020 election*, unequivocally does NOT reflect

information related to the November 2020 election," and (2) "whether the submission proves to a 100% degree of certainty that the data shown at the Symposium is not reflective of ***November 2020 election data***." (Emphasis added.)

The intent of the parties is determined from the plain language of the written contract, so long as the agreement is clear and unambiguous. *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004). The Panel should consider extrinsic evidence only if the document itself is ambiguous. *Blattner v. Forster,* 322 N.W.2d 319, 321 (Minn. 1982).

"Words or phrases found in a contract should not be interpreted out of context, but rather by a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract as a whole." *Cement, Sand & Gravel Co. v. Agricultural Ins. Co.*, 225 Minn. 211, 216, 30 N.W.2d 341, 345 (Minn. 1947); *Clapp v. Haferman Water Conditioning, Inc.*, 380 N.W.2d 838, 841 (Minn. Ct. App. 1986). A contract's terms should not be construed to lead to a harsh or absurd result. *Brookfield Trace Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998).

Both parties contend that the rules are unambiguous, and no parol evidence is required for contract interpretation. Lindell LLC argues that one need only consult a dictionary to interpret the contract. "Relating to," according to Webster's Dictionary means, "connected to" or "about." It argues that the data need only be connected to or about the election in some way. For example, it need only reference the candidates' names or polling places.

Mr. Zeidman argues that definition is far too broad and is "neither reasonable nor consistent with Mr. Lindell's claims about the data."

The Panel has determined that the Contest rules are directed to data "from the election" also referred to as "election data." The Contest did not require participants to disprove election interference. Thus, the contestants' task was to prove the data presented to them was not valid data from the November 2020 election.

As noted above, Mr. Lindell and his cyber-expert witnesses admitted that data to be provided from the election was to be in the form of packet data or PCAP data.[2] This is important, as Mr. Lindell explained, because such data can be examined by experts based on time stamps, addresses and other information from the packet to determine whether it was genuine.

Defining data as being merely "about the election" or "relating to the election" ignores the Contest rules' reference to data "from the election" and reference to "election data." These terms require the data not merely be about the election, but must be from the election process itself. As admitted by Mr. Lindell, this would be packet capture data. Thus, if data is not PCAP data, it is not from the election, and it therefore cannot be "related to the November 2020 election."

In fact, it would be unreasonable to conclude that any data about the election

---

[2] Lindell LLC emphasized at the closing argument that Mr. Zeidman testified that election data could be in another form than PCAP data. Of course, that could be true of election data that was not captured from the internet. It is, however, undisputed that election data that is captured from the internet, which Mr. Lindell said he would provide, would be in packets. This is because all data delivered over the internet is in the form of packets, as Dr. Frank explained.

is "election data."  Newspaper articles and broadcast news about the election are transmitted as data over the internet, for example.  It is unreasonable to conclude that any data file containing those accounts – or excerpts from such a file – would qualify as election data in a contest.  If such data qualified, the Contest would not really be a contest at all.

Lindell LLC notes that the Contest rules provide that "an alleged or actual ambiguity, discrepancy or inconsistency between disclosures or other statements contained in any Contest-related materials and/or these Official Rules (including any alleged discrepancy or inconsistency in these Official Rules), . . . will be resolved in Lindell's sole discretion."  But there is not, in the Panel's view, an ambiguity, discrepancy, or inconsistency to be resolved here, and the parties have both stated the contract is unambiguous.[3]  Thus, the contract is to be construed with due regard for the intent of the parties as expressed in the language of the agreement referring to information "from the election" and "election data."

As noted, the Contest rules provide that "[t]he three-member panel selected by Lindell will identify the winners based on their professional opinion that the submission proves to a 100% degree of certainty that the data shown at the Symposium is not reflective of November 2020 election data."  The parties agree that

_____

[3]  If there were an inconsistency to be resolved in Lindell LLC's discretion, its interpretation would apply only if it were reasonable.  *See Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006) (Noting that, "where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith — a requirement that includes the duty to exercise the discretion reasonably," and upholding rejection of a pension plan's interpretation.) As discussed above, an interpretation that any data that is simply about the election in some way suffices would be unreasonable.

this arbitration Panel is to now decide, based on the Contest rules, whether Mr. Zeidman met the challenge, entitling him to payment. No party contended otherwise in its pleadings, briefing, or argument.

### Analysis of the Data

The Panel will analyze Mr. Zeidman's alleged proof and the responses of Lindell LLC and its experts below.

### 1. *cExtract.mp4*

As noted, Mr. Zeidman was provided the, cExtract.mp4 file, Ex. J-8, on the first day of the Contest. In his report, Mr. Zeidman noted that this file is a video file with no sound. It shows manipulation of software source code on a capture of a computer screen with no further explanation. He concluded it does not contain information about the November 2020 election. Mr. Zeidman' s expert witness, Dr. Michael Brogioli, concurs.

Lindell LLC's expert witness, Mr. Gould, disagrees, as did the Contest judges. He notes the file demonstrates extraction of data. From this, he concludes Mr. Zeidman should have understood the video showed how to use the cExtractor tool to decode the data. He further notes that the source code shown in the video, although incomplete, is related to the election.

Dr. Frank, one of Mr. Lindell's advisors, testified the cExtractor tool could be used to decode election data. Mr. Sanders, one of the Contest judges, says he was able to learn how to use cExtractor from the video and used it to extract data from .bin files provided to contestants. A .bin file is a binary file. The Panel has not been

provided with whatever such extraction would have shown, although Mr. Sanders testified it would be similar to Exhibit J-13, without headings. J-13 is discussed below, as are the .bin files and Mr. Sanders claimed extraction of data from .bin files.

We conclude that Mr. Zeidman has shown that the cExtract.mp4 does not constitute election data. Instead, it is a demonstration of a tool used to extract data. This tool could have some role in extracting data from other files, as discussed below. But standing alone, it does not reflect election data, as the Panel has construed that term, and it therefore also does not relate to the November 2020 election.

### 2. *Chinese_SourceIP_HEX.txt*

This file, Ex. J-15, included hexadecimal data. Mr. Zeidman converted it to be able to read it. It contains, according to Mr. Zeidman, only IP addresses and numbers ranking the addresses from high to low. He notes that it is not packet data because it has no packets and no data. He thus concluded it does not contain 2020 election data.

Dr. Brogioli, concurs that the file cannot contain packet data because it is a rich text file, once converted. Packet data is transmitted in PCAP files – not rich text files. The rich text file contains no time stamps, recording of votes, names of voters, or evidence it contains election data. It is not in a format that a cyber expert could use to verify that the data was election data. Therefore, it cannot, Dr. Brogioli argues, be election data.

Mr. Gould disagrees. He claims that IP addresses in the file "resolve . . . to addresses in Mainland China . . ." He also notes that "it was alleged on stage at the

symposium in the presentations that China was a source of election interference with the 2020 election."  Because the challenge was to prove unequivocally that the data does not reflect information related to the 2020 election, he concludes Mr. Zeidman did not meet the challenge.[4]

We disagree.  Mr. Gould uses a construction of "election data" in the Contest rules that is unreasonable.  He would appear to adopt a construction that if the data could in some way possibly be about the election, it is election data.  But, under our construction, the rules require that a participant prove that the data provided is not from the November 2020 election. We conclude that Mr. Zeidman met that requirement as to the Chinese_SourceIP_HEX.txt file, and therefore he also has shown that the file also does not relate to the November 2020 election.

### 3.  *File Election Process Taxonomy.pdf*

Mr. Zeidman found that this file, Ex. J-5, contains a graphic depiction of voting machines and network connections, which is not election data. Not surprisingly, it does not appear Lindell LLC claims that this is election data from the November 2020 election.  We conclude Mr. Zeidman has proven this file does not contain election data that meets the Panel's definition.

### 4.  *FinalReult_2020_HEX.txt*

This file, Ex. J-17, also contained hexadecimal data.  Mr. Zeidman was able to display the file using the same technique as for the file labeled

---

[4] Mr. Gould also contends Mr. Zeidman's method for interpreting the data was unnecessarily complicated. This may or may not be true, but it is of little interest here.  The requirement is to prove the absence of election data. The proof need not be made in the easiest or most elegant way possible.

Chinese_SourceIP_HEX.txt, Ex. 15, noted above.  Even after he translated the file to rich text format, it remained unreadable, and it appeared to be encrypted or perhaps just gibberish.  It may be that it was unreadable because a cypher was placed on the file by those preparing the data for the Contest.  In any event, Mr. Zeidman has shown this file does not include packet data, and it therefore cannot contain election data, from the November 2020 election.  Mr. Gould, Lindell LLC's expert, did not address this file in his report.

### 5.  *rnx-000001.bin*

This file is one of three .bin files provided and will be analyzed with the other two below.

### 6. *Targets_HEX.txt*

This file, Ex. J-18, is also a hexadecimal file Mr. Zeidman was able to translate and view as a rich text file.  Upon translation, it did not reflect election data.  More specifically, Mr. Zeidman has shown this file does not contain packet data, and it therefore cannot be election data from the November 2020 election.  Mr. Gould does not address this file in his report.

### 7. *Target_MachineID_HEX.tx*

This file, Ex. J-19, is also a hexadecimal file.  Again, Mr. Zeidman was able to translate and view as a rich text file.  Upon translation, it did not reflect election data.  More specifically, Mr. Zeidman has shown this file does not contain packet data, and it therefore cannot be election data from the November 2020 election. . Mr. Gould does not address this file in his report.

8. *mx-000123.csv*

This file, Ex. J-13, is a very large spreadsheet.  It contains, among other things, columns with headings that reference dates on or around the election, names of cities, and "source" and "target" IP addresses, and the names of candidates Trump and Biden.

Mr. Zeidman noted in his report that the information in the spreadsheet does not include anything identifiable as packet capture data or the like.  Nor does it, he further notes, provide any information about what the information represents or how it was obtained.  It includes the names of most, if not all, of the Fortune 500 companies.

The spreadsheet generated from the file appears to be a summary of data.  At least part of the spreadsheet has had information added, including headers and additional columns.  But it is unknown who added that information or whether any of it is even a genuine summary of collected data. The spreadsheet contained numerous inconsistencies that would cause any reasonable person to question its authenticity.

Mr. Gould testified that the information in Ex. J-13 is something that would be worth pursuing given the dates involved, IP addresses of polling places, and other information.  He therefore concluded it had data that was related to the election.

But again, Mr. Gould uses a broader definition of election data than the Panel has concluded is appropriate in this case.  Mr. Gould testified that he had expected Lindell LLC to reveal packet capture data of the sort Mr. Lindell had testified he

had that would show the election data captured in real time, "like a movie."  Mr. Lindell LLC admitted that the data to be provided for the Prove Mike Wrong contestants was to be they type of data that could not be altered without the alteration being detected by cyber experts.  But the mx-000123.csv file just contained a purported summary of data on a spreadsheet, which apparently had been edited by someone to add headings and a significant volume of other information.

In short, Mr. Zeidman showed that the mx-000123.csv file is not from the election and that it therefore also does not relate to the November 2020 election.

### 9.    *Summary.rtf*

As Lindell LLC notes in its closing brief, this file, Ex. J- 11, is simply a summary of the day two files.  No claim is made that it meets the proper definition of election data.

### 10.    *rnx-000002.bin and rnx-000003.bin*

These two files, along with rnx-000001.bin, are exceptionally large binary data files, that is, strings of 1s and 0s.  Mr. Zeidman at first approached these files as packet data capture files, remembering Mr. Lindell had said he was planning to provide such files.  As noted, Mr. Gould and members of the Red Team were also expecting such files.  Mr. Zeidman used a tool known as Wireshark, which is commonly used to open .bin files, but it returned only an error message.  Mr. Zeidman then looked for information within the data in the files to try to learn what could be used to translate them, but found nothing.  Dr. Brogioli confirmed at the hearing and in his report that this approach was correct, and that no data could be

extracted from these files

Lindell LLC argues that Mr. Zeidman failed to use cExtractor, as taught in the cExtract.mp4 video, Ex. J-8, to open the .bin files.  Mr. Sanders testified that, if Mr. Zeidman had used cExtractor, he would have been able to create something very much like the mx-000123.csv spreadsheet file, Ex. J-13, but without the headings.  Mr. Sanders further testified that he was able to do this during the hearing using cExtractor.  As noted, the Panel was not presented with the spreadsheet Mr. Sanders claimed to have created.

None of this, however, shows that Mr. Zeidman has not proven that the .bin files did not contain what the Panel has defined as data from the election.

First, cyber experts would not be expected to analyze data that could only be extracted with a tool they did not have.  There is testimony that cExtractor may have been provided outside the Contest in one of hundreds of files provided by Josh Merritt, a member of the Red Team.  But the data at issue is the data provided to contestants as part of the Contest, not some data in hundreds of files informally provided later.

Second, if it is true, as Mr. Sanders says, that the .bin data yields a spreadsheet like Ex. J-13, but without column headings, we have already concluded that such a spreadsheet does not meet the definition of election data.

Throughout its arguments, Lindell LLC focuses on processes used to decode the data.  But that only goes to whether the spreadsheets came from the source files provided – not whether the information on the spreadsheets comes from the election.

Based on the foregoing analysis, Mr. Zeidman performed under the contract. He proved the data Lindell LLC provided, and represented reflected information from the November 2020 election, unequivocally did not reflect November 2020 election data. Failure to pay Mr. Zeidman the $5 million prized was a breach of the contract, entitling him to recover.

### B. Unconscionability Claims

In light of the foregoing, Mr. Zeidman's claim that he should recover because the rules of the Contest were unconscionable need not be further addressed. The Panel has concluded that the Contest rules cannot reasonably be read in the way Lindell LLC claims, and so are not unconscionable.

### C. Minnesota Consumer Fraud Act

Mr. Zeidman claimed that Lindell LLC violated the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69 (1988) by, among other things, creating a contest knowing it would not declare a winner and failing to provide 2020 election data as promised. Mr. Zeidman conceded at post-hearing arguments, however, that this claim need not be further considered if Mr. Zeidman prevails on his contract claim. Accordingly, this claim is denied as moot.

### D. Attorneys' Fees

The parties agree that that Contest rules do not provide for recovery of attorneys' fees and the only basis for an award of fees would be under the Minnesota Consumer Fraud Act. As no relief is provided under the statute, no fees are awarded.

# Award

1.      Robert Zeidman's claim against Lindell Management LLC for breach of contract is granted. Accordingly, within 30 days of issuance of this Award, Lindell Management LLC shall pay $5 million to Robert Zeidman.

2.      Mr. Zeidman's unconscionability claim is denied.

3.      Mr. Zeidman's claim under the Minnesota Consumer Fraud Act is denied as moot.

4.      Mr. Zeidman's request for attorneys' fees and costs is denied.

5.      The administrative fees and expenses of the American Arbitration Association totaling $16,175.00 and the Panel's compensation will be borne as incurred.

6.      This Award is in full settlement of all claims submitted to the Panel in this Arbitration.  All claims not expressly granted herein are denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

April 19, 2023

_____
David A. Allgeyer, Panel Chair

_____
Gary L. Benton, Arbitrator

_____
David L. Hashmall, Arbitrator