1  ARBITRATION BEFORE THE

2  AMERICAN ARBITRATION ASSOCIATION

3  File No. 01-21-0017-1862

4  -----------------------------

5  ROBERT ZEIDMAN,

6      Claimant,

7  vs.

8  LINDELL MANAGEMENT LLC,

9      Respondent.

10  -----------------------------

11

12  C O N F I D E N T I A L

13

14  ARBITRATION

15  VOLUME I of III

16  Tuesday, January 17, 2023

17  9:21 a.m.

18

19

20

21

22

23  Court Stenographer:

24  Myrina A. Kleinschmidt, RMR, CRR

25  Job No. 328528

**EXHIBIT 1**

1       A.   Well, Biden1 and Trump1 -- well,
2  Biden and Trump were the names of the candidates,
3  obviously, in the 2020 election.
4       Q.   Do you think that that is enough to
5  say that this is related to the 2020 election and
6  you don't get $5 million?
7       A.   I don't believe that just having the
8  names of the candidates in a spreadsheet
9  is that -- I was not under the impression we were
10  just simply looking for names of candidates in the
11  election.
12      Q.   Is that election data to you?
13      A.   My unders- -- no.  And my
14  understanding of election data would have to do
15  with the actual voting during the election.
16      Q.   So the numbers underneath those
17  columns, do you have any information that that's
18  actual voting in the election?
19      A.   I do not, except I think -- I don't
20  recall who -- one of Mr. Lindell's experts has
21  claimed that these numbers show the number of
22  votes that Biden and Trump originally got and the
23  number of votes that Biden and Trump eventually
24  got due to the fraudulent switching of votes.
25      But that makes no sense whatsoever.  A

**EXHIBIT 1**

1     the rules before you started the contest -- or the
2     challenge, I should say?
3         A.    I read the rules when I signed it.
4         Q.    All right. And in your deposition,
5     you said you were somewhat surprised by the rules,
6     yes?
7         A.    Yes.
8         Q.    Okay. The rules do not define the
9     term "relate to"; is that right?
10        A.    There was -- no. There was no
11    definition in the rules itself.
12        Q.    All right. But the rules do at two
13    separate places list the burden of proof, one of
14    which is 100 percent degree of certainty and the
15    other was unequivocal proof, correct?
16        A.    I think that's correct.
17        Q.    High burden of proof; do you agree?
18        A.    Yes.
19        Q.    All right. And is it your testimony
20    that the language of the rules is ambiguous in
21    some fashion?
22        A.    It's my understanding that the rules
23    need to be reasonable; that nothing in human
24    history, I think, can be proven to a hundred
25    percent degree -- mathematically a hundred

1  percent.
2       So I assume that to prove this to a
3  hundred percent meant a reasonable hundred
4  percent; not that, for example, aliens had come
5  down and changed the data or that somehow
6  transferring it to me from the web server it had
7  been modified, for example.
8       Q.   Mr. Zeidman, please focus on my
9  questions.  Okay?  You have the exact language
10 that you've read of the rules, correct?  And that
11 is Joint Exhibit Number 2.
12      A.   Yes.
13      Q.   You have that in front of you.
14      A.   I remember --
15      Q.   Is it your testimony today --
16      MS. JOSHI:  He doesn't have it in front of
17 him because you haven't provided it in front of
18 him.  But we can find it.  Hold on.  Here we go.
19 BY MR. BECK:
20      Q.   Is it your testimony that the
21 language of the rules is ambiguous in some sense?
22 Yes or no, please.
23      A.   Yes.  I think it is.
24      Q.   You were aware after reading the
25 rules referenced in paragraph 7 on page 3 [sic]

**EXHIBIT 1**

1  that ambiguities would be construed in favor of
2  Lindell Management; is that right?
3         A.   Yes.  I think that -- yes.  I
4  remember reading that.
5         Q.   Is it your claim in this arbitration
6  that that language in paragraph 7, Joint Exhibit
7  Number 2, somehow has to be read differently than
8  the plain language?  Yes or no.
9         A.   You know, I'm not a lawyer, and it's
10 hard for me to say what the language should be.
11 As an engineer and a forensic expert, I think
12 there's a degree of reasonableness.  I think
13 there's ambiguity in the way your people have
14 described it, but the way I understand it it has
15 to be reasonable.
16        Q.   So yes is the answer to my question?
17        A.   I'm sorry.  Could you repeat the
18 question?
19        Q.   No.  Sir, was your answer yes?
20        A.   I don't remember the question.
21        Q.   All right.  We'll try to focus in
22 here a little more closely.
23             What language in the rules is ambiguous in
24 your opinion?  Point to it, please.
25        A.   I can't point to specific language.

**EXHIBIT 1**

Golkow Litigation Services                                  Page 116

1   I understand the rules one way I think a
2   reasonable person would.  It's up to the lawyers
3   to determine whether the language is ambiguous or
4   not.
5        Q.   But you testified dozens of times
6   about what is and what is not related to the 2020
7   election, in your opinion, today, correct?
8        A.   That's correct.
9        Q.   All right.  Well, in light of that,
10  the words "related to the election" are contained
11  in the rules.  Is it your testimony that "related
12  to" is ambiguous?
13       A.   Not in my mind.  But I think it's
14  ambiguous in the way that Mr. Lindell's team has
15  been defining it.
16       Q.   Okay.  You know, in your deposition,
17  you referred -- or we discussed, I should say,
18  some examples.  I'm going to run those by you, if
19  I could, sir.
20       I asked you if the identities of voters
21  contained in the challenge data would be something
22  that would be related to.  Do you remember that?
23       A.   I seem to remember that.
24       Q.   On page 33, you said that was not
25  something that would be related to the election,

**EXHIBIT 1**

1  in your opinion, correct?
2      A.    I'm sorry.  Page 33?
3      Q.    Of your deposition.  Do you remember
4  that?
5      A.    I don't have my deposition in --
6      MR. GLASSER:  Why don't you just ask him a
7  question.
8      MR. BECK:  Are you instructing him?
9      MR. GLASSER:  No.  I'm just saying --
10     CHAIRMAN ALLGEYER:  If you want to make an
11 objection, make an objection.
12     MR. GLASSER:  I object.  I think he should
13 just ask --
14     CHAIRMAN ALLGEYER:  Although I prefer that
15 it be one counsel.
16     MS. JOSHI:  I will object, then.
17     MR. GLASSER:  Thank you.
18     CHAIRMAN ALLGEYER:  Overruled.
19     Go ahead.
20 BY MR. BECK:
21     Q.    When you talked about this at your
22 deposition -- I'm referring to page 33 of the
23 deposition.  You don't have to have it in front of
24 you.  I'm asking what you remember, sir.
25           I asked, would the identification of

**EXHIBIT 1**

1  voters in the data be something that would be
2  related to the election and you said no.  Do you
3  remember saying that?
4         A.    I don't know the context, but I could
5  have said that.
6         Q.    Let me ask you -- I'll just ask you
7  pointblank now.  If the identification of voters,
8  actual voters, in the 2020 election was contained
9  in the data, would that be something that, in your
10 opinion, was related to the election?
11        A.    As a hypothetical, I'd say no, in and
12 of itself.  I can get the names of voters off the
13 voter roll.  It doesn't mean they voted or how
14 they voted.
15        Q.    Okay.  I asked you, then, again on
16 page 33, what if the data had IP addresses for
17 voting places, voting locations, and your quote --
18 and your response was "I don't see how that
19 relates to the election."
20        Now, let's just assume that's what you
21 said.  Is that consistent with your position about
22 whether or not IP addresses for voting places
23 would be something that was related?
24        A.    Not in my opinion.  In the context of
25 the challenge, the contest as you described it,

**EXHIBIT 1**

1  there had to be some data relating to the specific
2  voting in the election, not a place to vote or a
3  person who may or may not have voted.
4       Q.   So if there was something about a
5  specific vote contained in the data, that is
6  something you would agree that was actually
7  related?
8       A.   If it was a specific vote cast in the
9  election, that would be something related to the
10 election, yes.
11      Q.   Fair enough.  We'll move on.
12           Is it your position that the data that was
13 provided have to show how they were verified in
14 order for it to relate to the election as you
15 understood the term?
16      A.   If I understand your question, I
17 think the data would need to be verifiable, and I
18 thought part of the challenge was for us experts
19 to verify it.
20      Q.   And where did that understanding come
21 from?
22      A.   From Lindell -- Mr. Lindell's
23 speeches and advertisements leading up to the
24 symposium.
25      Q.   He said, "We're going to ask them to

**EXHIBIT 1**

1 verify the data"?

2     A. He said something to that effect,
3 yes.

4     Q. Now, is it your position that if the
5 contest is, as you put it, impossible to win, that
6 is something that's not reasonable?

7     A. I believe so, yes.

8     Q. What if -- and, again, since we're
9 talking about hypotheticals, what if we all agree
10 the data are related to the election. Wouldn't
11 you assume, then, that the contest was impossible
12 to win?

13     A. I'm not sure I understand the
14 question.

15     Q. If the data were, in fact,
16 related--assume that, please--then the contest or
17 the challenge would be impossible to win, right?

18     A. I mean, it's saying -- you're saying
19 if the data were related to the election, then it
20 would be impossible to show it's not related to
21 the election. So yes, that would -- I guess that
22 would make it impossible to win.

23     Q. When you went to the symposium, as
24 you testified earlier, you thought that you would
25 not be able to win such a challenge, right? In

**EXHIBIT 1**