UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Lindell Management LLC Litigation | Case No. 0:23-cv-01433-JRT-DJF<br><br>**LINDELL MANAGEMENT LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO VACATE ARBITRATION AWARD** |

**INTRODUCTION**

Lindell Management LLC ("Lindell Management") asks the Court to grant its Motion to Vacate Arbitration Award as the Arbitration Panel in this case exceeded its power in issuing the award. Petitioner/Counter Respondent Robert Zeidman brought a Motion to Enforce the same Arbitration Award on August 4, 2023. Pursuant to the Court's Instructions, Lindell Management is submitting this Counter Motion, with the understanding that the competing Motions will be argued and heard together.

**PROCEDURAL BACKGROUND**

On April 19, 2023, an American Arbitration Association panel of arbitrators issued an Award against Lindell Management and in favor of Zeidman. (Petition for Order Confirming Arbitration Award ¶ 8, ECF. No. 1.) On May 18, 2023, Lindell Management filed an action in Hennepin County District Court to vacate the Award. (Petition ¶ 12, ECF. No. 1.) The following day, Zeidman filed a federal action to confirm the same award. (*Id.*) Zeidman's Counsel removed Lindell Management's state court action to this Court. The Court, by Order dated June 22, 2023, consolidated the competing actions under the

above case number, and entered a scheduling order providing for resolution by dispositive motion. The Parties were given until October 24, 2023 to submit their respective Motions. (ECF No. 20.) On August 4, 2023, Zeidman filed his Motion to Confirm. (ECF Nos. 22-24.) On August 25, 2023, Lindell Management filed its Memorandum in opposition to that Motion. Lindell Management now files its own Motion to Vacate.

## FACTUAL BACKGROUND

The "Prove Mike Wrong" Challenge was conducted in Sioux Falls, South Dakota on August 10-12, 2021. (Zeidman Memorandum at 2, ECF No. 24.) The contest involved a series of computer data files which were shown to the contestants. *Id.* The contestants were required to prove that the data files they were given were *not* "related to" the 2020 election. *Id.* More specifically, the Rules read as follows:

> [P]articipants will participate in a challenge to prove that the data Lindell provides, and represents reflects information from the November 2020 election, unequivocally does NOT REFLECT INFORMATION RELATED TO THE November 2020 election. . . .
>
> **YOU MUST READ AND SIGN THIS FORM AND RETURN IT TO THE FRONT DESK TO PARTICIPATE IN THE CHALLENGE**
>
> * * *
>
> Participation in the Contest constitutes Entrants full and unconditional agreement to an acceptance of these Official Rules and the decisions of Sponsor, which are final and binding. Winning a prize is contingent upon fulfilling all requirements set forth herein.
>
> * * *
>
> Participants must submit all of their evidence in writing to a three member panel selected by Lindell who will determine whether the submission proves to a 100% degree of certainty that the data shown at the Symposium is not reflective of November 2020 election data
>
> * * *

2

> In the event there is an alleged or actual ambiguity, discrepancy or inconsistency between disclosures or other statements contained in any Contest-related materials and/or these Official Rules (including any alleged discrepancy or inconsistency in these Official Rules) it will be resolved in Lindell's sole discretion.

(Schlesinger Declaration Ex. A., ECF No. 2, emphasis in original.) At hearing, Mr. Zeidman testified that this was not what he expected; he had believed that the issue would be whether "Packet Capture Data" files were contained in the data.[1] Nevertheless, he read the Rules and agreed to them before beginning the Challenge. (T. 114.)

At hearing, Michael Lindell testified as to the purpose of the Challenge:

> Q.   What was the purpose of the Prove Mike Wrong Challenge within the symposium?
>
> A:   It was to make -- to get -- to get -- I guess to get the attention, to get people there to see that it's from the 2020 election. Because the media, they were ignoring. They did not want this out. They did not want this – just like Reuters doing a hit job two months ago. Nobody wants this data out there. They don't want it out there. So to get there, you have -- yep, that's why I picked three things, the media, bring your own people that could read this and it's from the 2020 election, and then the politicians to say, "Hey, let's look into this."

(T. 317.) Everyone was quite clear on this point, as the Chairman of the Panel pointed out:

> CHAIRMAN ALLGEYER: But the purpose of your challenge was to say, "Here, guys, here's this data, and this has to do with the election." This is what –
>
> THE WITNESS: That's what the challenge was.

---

[1] "Packet Capture Data Protocol" files, or "PCAPs," are a form of data used to transfer information across the internet.

3

(T. 356.) There was no contrary evidence at hearing, and Mr. Zeidman has cited none. Therefore, Mr. Lindell confirmed that the purpose of the Challenge was to show that the provided data were "from the 2020 election." The Rules were drafted accordingly.

The only possible reading of the Rules was that contestants had to prove "to a 100% degree of certainty" that the data both are not somehow "related to" the 2020 election, ***and*** that the data are "not reflective of November 2020 election data." Neither "reflect" nor "relate to," as used above, was defined; the words must therefore necessarily be given their normal English meanings. In essence, the contestants were asked to prove a negative – that the data files were both "100%" and "unequivocally" *not* reflective of, the 2020 election, nor did they even "*reflect information related to*" the 2020 election. This is obviously an exceedingly high bar.

The Arbitration Panel appropriately noted that "[t]he Contest rules focused on the authenticity of the data rather than on what the data did or did not prove. . . ." (Arbitration Decision at 6.) Zeidman presented evidence that the information provided was not in "PCAP" format (internet packet capture files), and thus, in his opinion, could not "reflect" information about the election. He further testified that he believed the Rules had to be read "reasonably," and that the fact that the data admittedly *did* contain information which "referred" or "related to"[2] the election was not sufficient. (Arbitration Tr. at 94:1 – 15, 114:22 – 121:22.) On the other hand, Mr. Zeidman admitted that the data contained names

---

[2] This distinction between a literal reading of the contract and Mr. Zeidman's "reasonable" reading was not academic. At hearing, Mr. Zeidman testified, "I found no PCAP data, but there could potentially have been other data related to the election." (Arbitration Tr. at 135:23-25.)

4

of candidates, polling locations, internet addresses of polling locations, etc. (*E.g.*, Tr. 59, 61, 93, 142.) He explained away this apparent discrepancy by testifying that those data did relate to the election but did not show that votes were changed. (*Id.* at 143.)

These definitional issues were important, or even dispositive, to the Panel's decision. While Lindell Management argued that simple dictionary definitions of the term "relate to" should be applied by the Panel, Zeidman argued that such a reading was not "reasonable" nor consistent with Michael Lindell's **extrinsic claims (e.g., on television programs) about the data.** (Arbitration Decision at 12.) Thus, while the Panel concluded that extrinsic or parole evidence was not necessary for its analysis (*Id.*), it nevertheless considered that when defining the relevant terms.[3] In fact, the Panel imported wholesale pre-hearing statements made by Mr. Lindell in the media concerning "packet capture data." The Panel stated that Mr. Lindell admitted that the data in question must necessarily be in the form of packet capture data, and that Lindell Management's witness confirmed that all data which travels across the internet is in packet capture format. (Arbitration Decision at 13, n.2.) In doing so, the Panel completely ignored the testimony at hearing that *information contained in packet data* may have originally been transferred across the internet in packets, but then was later recorded in another format. (*E.g.*, Tr. 389.) The Panel thus took the original discussion of packet capture data, and bootstrapped it into a requirement that all of the data provided must necessarily have been in the form of packet

---

[3] In fact, the Panel stated that it should only consider extrinsic evidence in the face of contractual ambiguity (Arbitration Decision at 12), and then went on to state that it was stipulated that there *was no ambiguity* in this case. (*Id.*) Despite reciting these black letter principles, the Panel looked to extrinsic evidence to support its decision.

captures in order for the data to meet the requirements of the contest.[4] This conclusion was based on Mr. Lindell's out of court statements, and not on the language of the Rules themselves.

The Panel went from there to state, as a major premise that the "contestants were not required to prove election interference." (*Id*. at 13.) From that *non sequitur*, the Panel made a semantic leap, and stated that the real burden of proof required Zeidman to prove that the data provided were "not valid data from the 2020 election." (*Id*.) This use of the term "valid data," (a normative term) was made up out of whole cloth by the Panel. A requirement that Lindell Management present "valid" data effectively reversed the burden of proof in the case, and allowed Zeidman to succeed simply by showing something wrong with any of the (enormously vast) amount of data which was presented. The Panel concluded this analytical adventure by stating that it would be "unreasonable" to read the Rules literally, and thus the data must necessarily be related to "election processes," or else the "Contest would not really be a contest at all." (*Id*. at 13-14.) The net result of this analysis was that the Rules, which on their face stated Zeidman had to prove "unequivocally" that the data were "related to" the 2020 election, had somehow morphed into a requirement that Zeidman only prove that (some of?) the data provided were not

---

[4] At this point, the Panel demonstrated a simple misunderstanding of the arbitration's subject matter. The testimony was clear that *data* transferred across the internet must necessarily be in the form of packet captures. Once that data is transferred, it can be reformatted into any other format desired. (*E.g*., T. 412.) Dr. Douglas Frank testified that the "packet" in PCAP data is the "envelope," and the data contained in the packet is the letter that is sent through the mail.

"valid," and that the data did not relate to "election processes."  It was in this context that the Panel decided Zeidman had met his burden of proof.

## STANDARD OF REVIEW

A court's review of an arbitration award is admittedly limited, and the award is entitled to deference. *Prime Therapeutics LLC v. Omnicare, Inc.,* 555 F. Supp. 2d 993, 996 (D. Minn. 2008) (quoting *Stark v. Sandberg,* 381 F.35d 797, 798 (8th Cir. 2004)). The Federal Arbitration Act states that a court may vacate an arbitration award in the following circumstances:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  In this case, the Rules to be applied by the arbitration panel were very specific. The arbitration panel nevertheless reached a decision which is practically and logically impossible, thus effectively reversing the burden of proof in the case.  The panel further created new definitions and exceptions in pursuit of its own ideas of "justice."  In doing so, the panel exceeded its powers.  Thus, the requirements of subsection 4, above, are met.  In his Motion, Zeidman relies solely on the deferential standard of review, without adding any substantive argument.  In fact, Zeidman simply states that the standard is one

of deference, that the arbitration panel reached a decision, and that this Court should therefore defer. (*See* Zeidman Memorandum at 7.) While the standard is deferential, this Court is not a rubber stamp, and should consider the evidence before reaching a decision.

## ARGUMENT

### 1. Introduction

As will be shown, the Rules in this case created a very high, possibly even insurmountable burden for Zeidman. The Rules required contestants to prove "to a 100% degree of certainty" that the data provided were ***not*** "related to" the 2020 election. The term "related to" was not defined, and thus must necessarily be interpreted according to its ordinary meaning. This burden of proof, which is akin to proving a negative, did far more than require Zeidman to cast doubt on the authenticity of the data. Instead, he was required to *prove* beyond all doubt that the data were false. The Arbitration Panel did not find that this Rule was unconscionable or otherwise unenforceable. Instead, the Panel simply reversed the burden of proof, and found that since there was doubt about some of the data that were presented, Zeidman had met his burden.

### 2. The Arbitration Panel Exceeded its Power and the Award Should be Vacated Pursuant to the Federal Arbitration Act

This Court should overturn an arbitration decision if the arbitrators "exceeded their power." 9 U.S.C. § 10(a)(4). To determine the scope of the arbitrators' power, the Court must examine the contract. *Prime Therapeutics LLC*, 555 F. Supp. 2d at 999. In this case the contest rules provided that Minnesota contract law applies. Minnesota rules of contract construction are well-established, and not in contention. "When a contestant begins

8

performance, he accepts the offer, and a unilateral contract is formed." *Mooney v. Daily News Co. of Minneapolis*, 116 Minn. 212, 217-18, 133 N.W. 573, 575 (1911).  If no other act or statute defines the contractual relationship of the parties, then the Official Rules of the contest serve as the controlling contract.  *Barnes v. McDonald's Corp.,* 72 F. Supp. 2d 1038, 1043 (E.D. Ark. 1999).  Thus, the official rules of the Challenge, as written, should be dispositive of this case.

The issue here is therefore the burden of proof created by the Challenge Rules.  The legal standards which the Arbitration Panel must apply in this regard are strictly limited to the agreement between the Parties.  *See Prime Therapeutics LLC v. Omnicare, Inc.,* 555 F. Supp.2d 993, 999-1000 (D. Minn. 2008).  Zeidman appropriately notes that the Court should ask if the Parties had an agreement to arbitrate, and if so, whether the arbitrator had "the power to make the award that he made."  (Zeidman Memorandum at 7, citations omitted).  In other words, if the panel had no power *under the rules created by the agreement*, the decision should be overturned under subsection 9 U.S.C. § 10(a)(4).  This manifests when an arbitrator attempts to do what is "fair," rather than working within the parameters established by the parties.  *See, e.g., Oxford Health Plans LLC v. Sutter,* 569 U.S. 564, 569 (2013).  As will be shown, there is no plausible reading of the Rules which justifies the panel's decision.

3. **The Arbitration Panel Exceeded its Power by Expanding the Scope of the Contest Rules and Injecting Ambiguity Where the Parties Themselves Agreed that None Exists**

Interpretation of a contract does not include the power to disregard language or create a new (supposedly more fair) standard.  *E.g., Int'l Association of Sheet Metal*

9

*Workers v. Union Pac. R.R. Co.,* No. 8:21-cv-59, 2021 U.S. Dist. LEXIS 253538, at *16 (D. Neb. Dec. 10, 2021). "Words or phrases found in a contract should not be interpreted out of context, but rather by a process of synthesis in which the words and phrases are given a meaning in accordance with **the obvious purpose of the contract as a whole.**" *Cement, Sand & Gravel Co. v. Agricultural Ins. Co.,* 225 Minn. 211, 216, 30 N.W.2d 341, 345 (Minn. 1947)(emphasis added). "The Panel should consider extrinsic evidence only if the document itself is ambiguous." (Zeidman Memorandum at 12, ECF No. 24., *quoting Blattner v. Forster*, 322 N.W.2d 319, 321 (Minn. 1982).) Here the panel acknowledged that "[b]oth parties contend that the rules are unambiguous. . . " (Zeidman Memorandum at 12, ECF No. 24, and explicitly stated that "in the Panel's view, [there is not] an ambiguity, discrepancy, or inconsistency to be resolved here" (*id.* at 14). In the absence of ambiguity, extrinsic evidence should not have been considered, and only the plain language of the contract was relevant.

      The Rules state that "participants will participate in a challenge to **prove** that the data Lindell provides, and represents reflects information from the November 2020 election, unequivocally does NOT reflect information related to the November 2020 election." (Schlesinger Decl. Ex. A. at 1, ECF No. 2.) There are two parts to this sentence that the arbitration panel seems to combine into one. First, Lindell Management provided data that reflects information *from* the November 2020 election. So far, so good – Lindell Management obviously provided data samples to the contestants (and Mr. Zeidman, as noted, admitted that there *was* election data in these files). Second, participants must prove that the data provided to them does *not* reflect information *related to* the November 2020

10

election. The two requirements can only be read conjunctively. The first requires a showing of relation, the second requires contestants to prove (again, "unequivocally" and to a "100% degree of certainty") that the data are "not related" to the election. The first "sentence does not appear to represent an independent assertion, but instead serves merely as a referent for the assertion (and challenge) contained in the second sentence. . ." and as such, should not be read to be part of the challenge itself. *Republican National Committee v. Taylor*, 299 F.3d 887, 892 (D.C. Cir. 2002).

The *Republican National Committee* case is instructive, as it actually arose in the context of a "Prove Me Wrong" challenge. In that case, contestants were asked to prove a statement concerning budget spending "wrong" in order to win a prize. The court began its analysis by noting that (as here) the parties agreed there was no ambiguity in the contract, and the court could therefore construe the language as a matter of law. *Id*. at 892. The Court then considered two arguments from contestants, which argued that there were interpretations of the language at issue which *could* be construed as incorrect. The Court rejected those arguments for two reasons. First, as noted above, it held that preliminary statements by the defendant were made in order to define the second clause of the statement. The Court went on to state that the terms used by the Defendant were unambiguous as used in ordinary discourse. *Id*. at 893. Thus, although the plaintiffs in *Republican National Committee* admittedly could create confusion with a selective reading of the language, they could not overcome the plain language of the contract. *Id.* The Court of Appeals upheld summary judgment in the Defendant's favor. *Id.*

Just as in *Republican National Committee*, the Parties in this case had a contract with simple, unambiguous language. The Arbitration Panel agreed that the language was unambiguous (although it later, inexplicably, used parole evidence to interpret the language). As in *Republican National Committee*, Mr. Zeidman pointed out potential flaws in the data. (*E.g.*, Arbitration Decision at 14.) In doing so, he may have conceivably shown that not all of the data were related to the election, or that there were imperfections in the data. That does not prove "unequivocally" and to a "100% degree of certainty" that the data are not related to the election. Simple contract construction shows that the Panel's decision was incorrect and did not reflect the agreement to arbitrate. The Panel thus exceeded its powers. Lindell Management's Motion to Vacate the Award should be granted.

### 4. The Arbitration Panel Exceeded its Power by Rewriting the Unambiguous Terms of the Contest Rules

In addition to inventing a burden of proof that did not exist in the Rules as written, the arbitration panel lowered the burden for Zeidman to win the contest by injecting its own view of reasonability into the contest Rules. This is not permissible under the FAA. Arbitrators "may not ignore the plain language of the contract…." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38 (1987). An arbitrator's award should draw "its essence from the contract," and "not simply reflect the arbitrator's own notions of industrial justice." *Id. See also Keebler Co. v. Milk Drivers & Dairy Emples. Union, Local No. 471*, 80 nF.3d 284, 287 (8th Cir. 1996) (vacating an arbitrator's award when the arbitrator "was not construing an ambiguous contract term, but rather was imposing anew obligation upon

[a contracting party] thereby amending the [contract.]"); *Northwest Airlines, Inc. v. Intern'l Ass'n of Machinist & Aerospace Workers, Air Transport Dist. Lodge # 143,* 894 F.2d 998, 1000 (8th Cir. 1990) ("[T]he arbitrator may not disregard or modify unambiguous contract provisions [and] if the arbitrator interprets unambiguous language in a way different from its plan meaning, [the arbitrator] amends or alters the agreement and acts without authority." (Internal citations and quotation marks omitted)); *Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187 (8th Cir. 1988) (vacating an arbitration award when "[t]he contract language before us here is plain and unambiguous, and the arbitrator disregarded it[.]").

Here, the panel, and the parties, *conceded* that there was no "ambiguity, discrepancy, or inconsistency" to be resolved and, instead, that the Contest Rules were plain and unambiguous. (Arbitration Decision at 14.) Despite this, in no fewer than seven places, the Panel rejected the plain reading of the Contest Rules and, instead, decided that the words "relate to" must mean that the data be: (1) in packet capture format; *and* (2) be related to "election processes." (*Id* at 13.) In doing so, the Panel "was not construing an ambiguous contract term, but rather was imposing a new [less onerous] obligation [upon Zeidman] thereby amending [the Contest Rules]." *Keebler Co*, 80 nF.3d at 287. Such amendment was impermissible and exceeded the Panel's authority.

As noted above, Mr. Zeidman was easily able to point out that each of the files did not contain packet capture data (in fact, it hardly required a computer expert to do that). For the second requirement, the Panel appeared to be looking for evidence that votes were changed in the 2020 election. In doing so, it converted the subject matter of the Contest

13

from one concerning the providence of the data to one concerning proof of election fraud. There is *no way* to read the Contest Rules and arrive at that conclusion. The Panel was simply substituting its own notions of what it believed to be "fair" or "reasonable" for the deal agreed to by the Parties. In doing so, it exceeded its authority under the arbitration agreement. Its decision should be vacated.

**5. The Arbitration Panel Exceeded its power by Flipping the Burden of Proof from Zeidman to Lindell Management**

The Rules state that it was *Zeidman's* burden to prove that the data "unequivocally does NOT reflect information related to the November 2020 election." (*Id.*) Nowhere do the Rules state that Lindell Management had to show the data related to "election processes" (a concept made up by the Panel without explanation), nor to prove the 2020 election was somehow fraudulent (the Rules are completely silent on that point).

In its decision, the Panel flipped the burden of whether the election data is from the election processes to Lindell Management. As noted above, the Panel interpreted the Rules to mean that Zeidman had only to show that the data were not "valid," and that they did not reflect "election processes." Further, the Panel required *explicitly* that the data provided be in packet capture format in order to be sufficient. If they were not, they were *ipso facto* not "related to the election," and Mr. Zeidman would win. (*See* Arbitration Opinion at 18)("Mr. Zeidman has shown this file does not include packet data, and it therefore cannot contain election data, from the November 2020 election"). This same "analysis" was

14

repeated with regard to all of the substantive data files that were provided.[5]  (*Id*. at 18-20.) Because Michael Lindell had discussed packet data in the media, the Panel imported that requirement into the contest.  Mr. Zeidman was able to succeed, in the Panel's eyes, simply by pointing out that each set of data did not constitute "packet captures."  On page 14 of its Opinion, the panel concluded that simply because a piece of data was *about* the election did not mean it "related to" the election, because in that case "the Contest would not really be a contest at all."  Therefore, in order to make the contest more "reasonable," the Panel imported extrinsic evidence (Mr. Lindell's media statements) and concluded that Mr. Zeidman need only show that the data were not in packet capture format.  In doing so, the Panel *did* insure that this was "no contest at all."  The provided data were *not* in packet capture format, and Mr. Zeidman did nothing more than demonstrate that in his report.  This has nothing to do with the Rules Mr. Zeidman agreed to, nor is it a legal or rational reading of the Rules.  The Panel exceeded its authority in reaching this tenuous conclusion.

---

[5] A few of the provided files consisted of instructions to the contestants, or in one instance an executable application designed to be used as part of the contest.  These obviously did not contain direct "election data."  Mr. Zeidman nevertheless went through the exercise of pointing out that those files did not contain PCAP data.

15

## CONCLUSION

In this case, the arbitration panel exceeded its authority and the award should be vacated.

Dated October 10, 2023.                     **PARKER DANIELS KIBORT LLC**

By */s/ Alec J. Beck*
   Andrew D. Parker (#195042)
   Alec J. Beck (#201133)
   888 Colwell Building
   123 N. Third Street
   Minneapolis, MN 55401
   Telephone: (612) 355-4100
   parker@parkerdk.com
   beck@parkerdk.com

   *Attorneys for Respondent Lindell Management LLC*