```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
       ------------------------------------------------------------
 3                                    )
       Robert Zeidman,                )    File No. 23CV1433
 4                                    )         (JRT/DJF)
               Plaintiff,            )
 5                                    )
       vs.                            )    Minneapolis, Minnesota
 6                                    )    January 3, 2024
       Lindell Management LLC,        )    10:22 A.M.
 7                                    )
               Defendant.             )
 8                                    )
       ------------------------------------------------------------
 9
                BEFORE THE HONORABLE JUDGE JOHN R. TUNHEIM
10                     UNITED STATES DISTRICT COURT
                            (MOTIONS HEARING)
11
       APPEARANCES
12       For the Plaintiff:         Bailey & Glasser
                                    CARY JOSHI, ESQ.
13                                  1055 Thomas Jefferson Street NW
                                    Suite 540
14                                  Washington, DC 20007

15                                  Nichols Kaster, PLLP
                                    DAVID E. SCHLESINGER, ESQ.
16                                  80 South Eighth Street
                                    Suite 4600
17                                  Minneapolis, MN 55402

18       For the Defendant:         Parker Daniels Kibort LLC
                                    ALEC J. BECK, ESQ.
19                                  123 North Third Street
                                    Suite 888
20                                  Minneapolis, MN 55401

21       Court Reporter:            KRISTINE MOUSSEAU, CRR-RPR
                                    300 South Fourth Street
22                                  P.O. Box 1005
                                    Minneapolis, MN 55415
23

24          Proceedings recorded by mechanical stenography;
       transcript produced by computer.
25
```

1                            **10:22 A.M.**

2

3                        **(In open court)**

4              THE COURT:  You may be seated.  Good morning,

5      everyone.

6              This is Civil Case Number 23-1433, Robert Zeidman

7      versus Lindell Management LLC.  Counsel, would you note

8      appearances, please.

9              MS. JOSHI:  Cary Joshi.

10             THE COURT:  Would you stand?

11             MS. JOSHI:  Sorry.  Yeah.

12             Cary Joshi and David Schlesinger for Robert

13     Zeidman, and this is Mr. Zeidman.

14             THE COURT:  Good morning to all three of you.

15             Thank you for coming, Mr. Zeidman.

16             MR. BECK:  Good morning, Your Honor.  Alec Beck

17     for Lindell Management.

18             THE COURT:  All right.  Good morning to you,

19     Mr. Beck.

20             All right.  We have two motions, one to confirm

21     and one to vacate the arbitration award in this case.

22             The Court has read the briefs.  Ready to hear

23     argument.

24             The motion to confirm was filed first, so I guess

25     we will start that way.

1          MS. JOSHI:  Thank you, Your Honor.

2          THE COURT:  Ms. Joshi, am I pronouncing it

3     correctly, Joshi?

4          MS. JOSHI:  Yes, you are.

5          THE COURT:  Okay.

6          MS. JOSHI:  Good morning, Your Honor.  Cary Joshi

7     representing Robert Zeidman.

8          The sole argument made by Lindell Management LLC

9     in opposition to our motion to confirm and in support of

10    its motion to vacate is that under Section 10(a)(4) of the

11    Federal Arbitration Act the arbitration panel here exceeded

12    its powers.

13         Yet, under the incredibly narrow standard of

14    review, when an award is challenged under 10(a)(4), the

15    sole question for the Court, according to the Supreme Court

16    in *Oxford Health*, is whether the panel even arguably

17    interpreted the parties' contract, not whether they got

18    that interpretation right or wrong.

19         Under *Oxford Health*, the Court's inquiry should

20    be at an end if you find that the panel did interpret the

21    contract and that they had the power to interpret the

22    contract, and that is what the panel did.

23         But if you do go further and look at the panel's

24    actual decision, it only further supports confirmation in

25    this case.

1          So first, the narrow standard of review.  That

2     standard has been described by the Eighth Circuit as among

3     the narrowest known to the law.

4          THE COURT:  Probably in one of my cases that went

5     up there.

6          MS. JOSHI:  In *Brotherhood of Maintenance of Way*

7     *Employees*.  The Eighth Circuit further held in *Stark v.*

8     *Sandberg* that an arbitration award must be confirmed, "So

9     long as the arbitrator is even arguably pursuing or

10    applying the contract and acting within its authority."

11         To determine if the panel here, which was made up

12    of three members chosen by both sides, was acting within

13    its authority, the Court must look to the arbitration

14    agreement itself, which is contained in the "Prove Mike

15    Wrong Challenge" rules drafted by Lindell Management.

16         Under the incredibly broad arbitration provision

17    in the contest rules, the panel clearly had the authority

18    to interpret the contract.  Those rules state, "Any claim,

19    dispute or controversy whether in contract, tort or

20    otherwise arising out of, relating to or connected in any

21    way with the challenge or the breach, enforcement,

22    interpretation or validity of these terms and conditions

23    shall be resolved exclusively by final and binding

24    arbitration."

25         There is simply no doubt that Lindell gave the

1    panel the authority to interpret the contract, and so

2    that's what they did.  They analyzed the section of the

3    rules setting forth what contestants in the "Prove Mike

4    Wrong Challenge" had to prove.

5         The panel interpreted the rules giving, as they

6    said, "Due regard for the intent of the parties as

7    expressed in the language of the agreement."

8         They found that the rules themselves centered on

9    the analysis of the authenticity of the data to be provided

10   to contestants and not on disproving something else about

11   that data, such as that it showed election interference.

12        Lindell agrees with this approach.

13        THE COURT:  So I have a question about this.

14        The material that was provided by Mr. Lindell's

15   expert, I guess Mr. Montgomery, where did that material

16   come from?  I take it it wasn't packet capture data, but

17   where did it come from?  It wasn't clear.

18        MS. JOSHI:  Yeah.  So it wasn't perfectly clear

19   either in the case, Your Honor.  Dennis Montgomery is the

20   person to have said to have sold the data to Mr. Lindell.

21        He claimed that it came from the Internet and

22   showed votes going back and forth between voting machines

23   during the 2020 presidential election.  The source of the

24   data was never authenticated.

25        THE COURT:  I see.  So it came from the Internet

1    but not authenticated as what they referred to as packet

2    capture data.

3              MS. JOSHI:  Allegedly came from the Internet.

4    Was not authenticated as packet capture data.  Exactly.

5              And the panel concluded that election data as

6    used in the contract was to be valid data from the 2020

7    election process, and they didn't look to the facts of the

8    case.  They didn't say this data had to be PCAP data.

9              They looked at just the terms of the contract and

10   established what that meaning of 2020 election data was.

11   They exercised the power given to them.  They didn't exceed

12   it.

13             What Lindell is really arguing is with the

14   panel's interpretation.  Lindell wanted the panel to focus

15   on different words and wanted it to look at what "related

16   to" meant in the contract.  They --

17             Lindell argued that "relating to" should be

18   interpreted as so broad as to encompass almost any data, no

19   matter the source or the format of that data.  For example,

20   Lindell argued that the files provided to the contestants

21   that contained IP addresses that could be traced to

22   locations in China were related to the 2020 election

23   because there were claims by some that China interfered in

24   the 2020 presidential election.

25             THE COURT:  Did the panel consider whether the

1    packet capture data, whether packet capture data itself

2    could be altered, or did they not even get into that?  They

3    just made the determination that in order to be valid, the

4    election data for the contest, it had to be data that was

5    captured in this packet format.

6            That's as far as they went.

7            MS. JOSHI:  I think their thought process was,

8    first how do we define 2020 election data?  It's valid data

9    from the 2020 election process.

10           Then they looked to the facts and said the

11   contestants were told they were being provided data from

12   the Internet.  This is not data from the Internet because

13   it did not come in the format it would if it had been from

14   the Internet, and therefore it's not valid.

15           So first, they interpreted the term, and then

16   they applied it to the facts.  And so whether or not it

17   could have been altered, the fact that it was said to come

18   from the Internet and my client, Mr. Zeidman, showed that

19   it had not come from the Internet, that was the decision

20   made by the panel.

21           THE COURT:  Was there anything in the contract

22   that required any kind of deference to the initial panel

23   that looked at this?

24           MS. JOSHI:  There wasn't anything in the contract

25   that gave deference.  At the hearing, and as the panel

1    stated in their decision, we all agreed that their role was

2    to, once they interpreted the contract, then sort of play

3    the role of the panel and decide whether or not Mr. Zeidman

4    had met the requirements of the contest, and so that's the

5    role they took on.

6          The panel found that Lindell's interpretation

7    ignored references contained within the rules, that the

8    data was from the election and had to be election data.

9    The panel found this to be an unreasonable result.

10         As the Supreme Court made clear in *Oxford Health*,

11   if the arbitrator has been given the power to interpret the

12   contract, as the panel was here, then disagreement with the

13   interpretation is not a basis to overturn the award.

14         We contend that applying this restrictive award

15   alone is more than a sufficient basis to confirm the award

16   but that looking at the actual decision only reinforces

17   confirmation, and that's what we were just talking about,

18   what was the panel's process in first interpreting and then

19   applying.

20         Their interpretation came from the words of the

21   contract itself.  They then determined whether or not

22   Mr. Zeidman showed that those eleven files provided to the

23   contestants were not valid data from the 2020 election

24   process.

25         They listened to the witnesses.  They looked at

1    the evidence, and based on that evidence, they found that

2    he did indeed fulfill the requirements of the contest.

3           Given the narrow review standard, as well as the

4    panel's well thought out and well reasoned decision in this

5    case, we respectfully ask that the Court confirm the award,

6    deny the motion to vacate and order Lindell Management to

7    pay the judgment within 15 days of the Court's order.

8           Thank you.

9           THE COURT:  Thank you, Ms. Joshi.

10          Mr. Beck?

11          MR. BECK:  Thank you, Your Honor.  May it please

12   the Court and counsel.

13          Your Honor, I practiced for, I'm not going to say

14   how many years at this point, but a long time in the labor

15   law area, and my experience in this particular area of law

16   deals with labor arbitration cases.

17          But that being said, it's the same standard under

18   the Federal Arbitration Act, and look, I'll be very candid.

19   We understand it's difficult to overturn an arbitration

20   award.  You just heard a lot of boilerplate law to that

21   effect, and that's fine.

22          The issue here, and just to answer your question,

23   Your Honor, the Supreme Court and the Court of Appeals have

24   made a distinction under Section (a)(4) between

25   interpreting a contract, which is fine, and changing the

1    contract or rewriting a contract, and that's a difficult

2    line to draw.

3         Sometimes it's going to be very fact dependent,

4    but I can tell you that this case presents a very stark

5    example of arbitrators saying they just didn't like the way

6    this was written, and so they were going to rewrite it in

7    what they determined a more reasonable way.

8         I'll get to that in minute, but that's exactly

9    what they said here.  That's what the FAA says you cannot

10   do under 10(a)(4).  If you exceed the powers, if you do

11   what you consider to be fair or reasonable, or in labor law

12   we say if they impose their own notions of justice when

13   reviewing a contract, that's not what is supposed to

14   happen.

15        So I'm going to work backwards, Your Honor, if I

16   may, and I am going to start with the rules here and first

17   answer your question.

18        And Ms. Joshi, with respect to her, the rules

19   very specifically say that all ambiguities within the rules

20   are resolved in favor of Lindell Management, and that's in

21   the documents that have been submitted to the Court.

22        So in terms of whether there is deference or not,

23   I would say that certainly, that is deference in that case.

24        All right.  Page 5 of the decision, the

25   arbitration decision, lists the rules here, and the rules

1    are convoluted.  They are a little bit awkwardly drafted.

2    I admit that, but they're also very clear in the words that

3    are used here.

4           And the best statement of the rule here is in

5    paragraph 1 on page number 5, which says that the

6    contestants, Mr. Zeidman in this case, were required to --

7    this is the quote, unequivocally -- "Will show

8    unequivocally the data does not reflect information related

9    to the November 2020 election."

10          And we're supposed to take a look at the very

11   common way of reading that.  So it's two steps.  Ms. Joshi

12   went right by the "reflect" comment and went to the

13   "related to" comment.

14          That's fine.  That's half of it, but this is data

15   that is related to the election and the common use of that

16   term or any data that reflects information that is related

17   to.

18          There is no other way to read this.  That means

19   anything about the election or even touching on the

20   election probably meets this standard, and recall that for

21   purposes of the contest, Mr. Zeidman was required to prove

22   "unequivocally," quote, and quote, "to 100 percent degree

23   of certainty" that this information did not reflect

24   information that is related to the election.

25          That's a very high standard.  It's proving a

1    negative in some sense, so very difficult.

2           THE COURT:  Do we know where the information that

3    Mr. Montgomery sold came from?  It appears to be the

4    Internet, but that's a fairly broad commentary.

5           MR. BECK:  Mr. Montgomery is not saying, and he

6    has intimated that it comes from a number of sources, all

7    of which are on the Internet in some sense.  It clearly

8    came from the Internet.  Everything comes from the Internet

9    these days, Your Honor.

10          My outline for today was e-mailed to me this

11   morning.  Came off the Internet.  You know what?  It's not

12   in a packet capture format, but I digress.

13          The data involved here were monumentally big.  It

14   was terabytes of data, and that was one of the

15   complications here.  They took a slice, what they called a

16   slice of the data, and the data were not in packet capture

17   format.

18          So spoiler alert here:  I'm going to tell you

19   they were not in fact in that format.  Packet capture or

20   PCAP is a format for data.  It's not data itself, and

21   adhering, the computer experts who know more than I do

22   certainly, referred to this as the envelope in which you

23   put the letter which contains the information.

24          So everything goes across the Internet, and yes,

25   everything is in a packet capture format at some point, but

1    the data that is in that file is then manipulated or used

2    or stored in some other fashion.

3              So getting back to the rules here, the rules are

4    very, very broad, and Mr. Zeidman recognized that, I think,

5    because he took the position at trial -- and this is on

6    page 13 of the decision -- that it can't mean that.  It

7    can't mean what it would mean in ordinary terms because

8    that would be, as he put it, unreasonable.

9              And the panel seemed to buy into that argument

10   because they recognized, I think, as you'll see, that under

11   the literal language of the contest, Mr. Zeidman would

12   lose.

13             And so I'm just going to draw the Court's

14   attention to what I think is the dispositive language here,

15   pages 13 and 14 of the decision.

16             This is the quote:  "It would be unreasonable to

17   conclude that any data about the election is election data.

18   If such data qualified, the contest would not really be a

19   contest at all."

20             So at that point they rewrote the contest to mean

21   something else.

22             THE COURT:  Well, it seems that they were --

23   "struggling" is probably not a word.  Maybe it was easy for

24   them.  I don't know, but they were trying to figure out a

25   way to make sure that the information that Mr. Lindell

1    provided to Mr. Zeidman was accurate and legitimate.

2           And I guess they relied on the PCAP formatting to

3    determine what is legitimate data and what is not, I guess.

4    I don't know.

5           Maybe that's just a guess on my part.

6           MR. BECK:  The answer to that question is

7    complicated, Your Honor, because as part of what I'm going

8    to call "analysis" -- and I'm using air quotes when I say

9    that -- they did say, okay, one, it has got to be valid

10   data, and then it has got to be related to election

11   processes.

12          They didn't define "valid data."  They didn't

13   define "election processes."  They just said this, and then

14   they said, and we're going to decide if it is not in PCAP

15   format it doesn't meet any of those things, and therefore

16   it's not related to the election or it doesn't reflect

17   information that is related to the election.

18          It's a long series of chains in their analysis.

19   That is in fact what they would have said they were doing.

20   However, in doing so, they incorporated something that was

21   completely outside of the contract.

22          And I'm just going to skip ahead to that point

23   since they brought it up, Your Honor.  The PCAP thing runs

24   throughout this entire case.

25          To refer back to the panel's statement about not

1    being much of a contest, if the only issue was showing that

2    the one PCAPs in the data that were provided, that wouldn't

3    be much of a contest, either, because they weren't and

4    everybody said that at the beginning, including

5    Mr. Zeidman.

6          So to be blunt, and I hope this is respectful,

7    but if that's all he had to do, I could have done it, and I

8    am no computer expert, believe me.  But if I knew there

9    were five million dollars I could claim, perhaps I would

10   have done that.  I don't know.

11         Look.  The PCAP issue was imported wholesale, and

12   by way of background, the panel said, and this is on page

13   12, "The rules are unambiguous, and no parol evidence is

14   required for contract interpretation."

15         Okay.  That's basic law.  Then they went on on

16   page 14 to say, we're going to decide this based on the,

17   quote, "Intent of the parties as expressed in the language

18   of the agreement."

19         Great.  That is exactly what they were supposed

20   to do, obviously, but they didn't do that.  They started

21   off with this idea as a major premise that got to be PCAPs

22   because they just went through that analysis I talked

23   about.

24         Where did that come from?  It came from extrinsic

25   evidence.  There was nothing in the rules about PCAPs, and

1   there are a number of ways that this can be shown from the

2   record in front of us.

3          But if you look at pages -- page 13 of the

4   decision, they just come out and say Mr. Lindell admitted

5   that PCAPs had to be there for there to be election data.

6   They say it twice, actually.

7          Once they got to that conclusion, it was very

8   easy for them to say Zeidman won because all his report

9   says, there are no PCAPs.  I've definitely shown that.

10  Okay.  Fine.

11         But there was never any testimony or any document

12  or any evidence that PCAPs were part of this, and in fact

13  Mr. Zeidman -- this is quoted in our brief -- was very

14  upset when he got to the symposium because he said, look, I

15  thought there was going to be PCAPs here we were going to

16  look at.

17         He said he thought that when he was reading the

18  rules he was presented on the first day of the symposium.

19  He signed the rules anyway, despite knowing that PCAPs were

20  not in there.

21         Both parties have cited to the decision talking

22  about how all of the experts were saying, wait a minute,

23  there are no PCAPs here.  And there was testimony from one

24  of our experts, Doug Frank, saying, no, we didn't give

25  PCAPs.  That's fine.

1           So that was out in front.  So if you're using

2     that as the reason to say Zeidman should win, then we have

3     blown the whole contest completely open.  We have changed

4     the contest at that point.

5           Here's the thing.  The evidence, if you want to

6     call it that, about PCAPs and what Mike Lindell said about

7     that comes from television clips that were played by

8     Ms. Joshi during her opening statement for the arbitrators'

9     benefit, and they were very good.  They were very

10    effective.

11          Mr. Lindell likes to go on television, and he

12    said some things.  He never testified about that at

13    hearing.  He never said this is the symposium, this is the

14    "Prove Mike Wrong Challenge."

15          Those are things he said somewhere else.  This is

16    hearsay.  This is extrinsic evidence which the panel said

17    we don't need that, but they did it anyway.

18          The use of audiovisual at trial is very

19    effective, but sometimes it kind of blows people away and

20    impresses them a little too much.  It did in this case.

21    That's the only evidence that PCAPs would have been part of

22    this.

23          So bringing that in is parol evidence.  It's

24    extrinsic.  It's hearsay, and it totally changed the nature

25    of this contest.  It made it into a gimme for Mr. Zeidman,

1    and that was not what was planned obviously because if you

2    look at the rules, that's not what it says.

3         And we have cited a couple cases, so has counsel.

4    I mean, there are 100 cases on this point.  They're all

5    over the place, as you know.

6         The Eighth Circuit in this *Northwest Airlines*

7    case that we cited on page 13 of our brief is instructive,

8    I think, because the union in that case had a last chance

9    agreement bringing somebody back to work who had been

10   terminated, and the employee was supposed to jump through a

11   number of hoops regarding a driver's license.

12        He didn't do that.  He didn't do it technically

13   correctly, so he was terminated again.  The arbitrator put

14   him back to work saying, this is a quote:  "The intent and

15   purpose of the settlement in any material sense was not

16   violated."

17        Well, Judge Rosenbaum and then the Eighth Circuit

18   said that's not good enough because they had a deal, and he

19   didn't live up to the deal, so therefore we're going to

20   look at the language because, again, the language is clear.

21   Common usage of that language, and no parol evidence comes

22   in.

23        The second case is a little more fun, I guess,

24   *Republican National Committee*.  You may remember Haley

25   Barbour, who is the chair of the RNC.  He liked to make

1    dramatic statements, so he had a prove-me-wrong challenge.

2           And the "prove me wrong" was that the

3    republicans' plan at that time -- this is 20 years ago --

4    would not cut Medicare spending.

5           Well, somebody came up with a pretty good theory

6    saying, yeah, it does, it actually does in some ways.  The

7    DC circuit rejected that and said look --

8           THE COURT:  That wasn't an arbitration, though,

9    was it?  It was a simple interpretation of the contest?

10          MR. BECK:  It was.  It was, Your Honor.  It was.

11          But the exact same types of ideas apply here, and

12   because it's a prove-me-wrong challenge, well, I grabbed it

13   for purposes of this.

14          When you have a contract like this and it says

15   what it says, you can parse the language forever and come

16   up with a different interpretation, but that's not good

17   enough.

18          Before I leave this topic, the PCAPs, the

19   television clips that were shown at hearing with great

20   fanfare, it's important not because the arbitrators got it

21   wrong, they clearly did, but that's not the entire point.

22   It shows how they changed the rules.

23          And I just want to emphasize, everybody

24   acknowledges this.  Mr. Zeidman testified about this.  I

25   said he showed up, and he admitted that he thought -- he

1     read the rules and he said this is not what I thought it

2     was going to be.  I thought that we were going to talk

3     about PCAPs.

4            He also testified -- this is in footnote 2 of our

5     opening brief.  He said, yeah, there is information in

6     there that's related to the election.  I'm just not sure it

7     proves anything.

8            So he said, yeah, it's related to.  Well, what

9     else does "related to" mean?  We can go through that long,

10    long four-step process the arbitration panel did, or we can

11    use common meaning and not import extrinsic evidence, like

12    the panel said it was going to.

13           So the rules were unambiguous here.  We

14    stipulated to that.  Counsel both said, yeah, they're

15    unambiguous, and the panel repeated it.

16           The meaning of the rules said what it said.  It

17    said, gees, almost anything is going to be good enough

18    here.

19           And their testimony was, and this is Mr. Zeidman

20    again.  Look, there were polling places in there.  There

21    were candidates' names in there.  There was other

22    information about polling and votes and that sort of thing.

23    I just don't think it proves that things were changed in

24    the election.

25           That's not good enough.  That wasn't what the

1    contest was.  If it was, it would have said that.

2              So, Your Honor, under 10(a)(4), clearly this

3    panel got beyond its skis, and it decided to make this a

4    fair or reasonable, as it put it, contest and in doing so

5    went beyond its authority, and we would ask that the

6    decision be vacated.

7              THE COURT:  All right.  Thank you, Mr. Beck.

8              MR. BECK:  Thank you.

9              THE COURT:  Did you have any brief reply,

10   Ms. Joshi?

11             MS. JOSHI:  Yes, briefly.

12             THE COURT:  Go ahead.

13             I will give you an opportunity to reply as well.

14             MR. BECK:  Thank you.

15             MS. JOSHI:  Your Honor, contrary to Mr. Beck's

16   assertion, the panel did not go outside to define the terms

17   of the contract.  They first defined the term "2020

18   election data."  They then went to the contest and looked

19   at what the contest was about.

20             Mr. Lindell absolutely testified that what was

21   supposed to be given was data from the Internet in the form

22   of packets, and he described it several times within his

23   deposition and at the trial.

24             Whether or not there were television clips used

25   in my opening argument, we can agree that that is not

1    relevant here, and what is more important is that the panel

2    said it was not relevant.  They did not look at extrinsic

3    information to define the terms of the contract.

4         They then absolutely appropriately looked at the

5    evidence from the contest to decide whether or not

6    Mr. Zeidman had indeed shown that that data was not from

7    the 2020 election.

8         They didn't say that the election data had to be

9    PCAP data.  What they said is, the "Prove Mike Wrong

10   Challenge" was supposed to be about Internet data.

11   Mr. Zeidman showed this is not Internet data.  Therefore,

12   he has shown what he was supposed to show under the rules.

13        What is clear here is that the rules were written

14   poorly, but the panel did their job in not going outside

15   the words of the contract.  They interpreted the contract,

16   and under 10(a)(4), that interpretation should stand.

17        Thank you.

18        THE COURT:  Thank you, Ms. Joshi.

19        Anything else, Mr. Beck?

20        MR. BECK:  I was advised when I got sworn in to

21   never rebut, but I sometimes find it difficult.

22        Your Honor, with regard to what Mr. Lindell said

23   at hearing, the panel on page 13 of its decision did say

24   that he said this, but they don't have any citations to the

25   record.

1            And I feel like I have been blowing this into the

2      ether for now the past year.  I went back and looked, and I

3      looked at the briefs of Mr. Zeidman, and they don't cite to

4      the record for that, either.

5            So I went back to the arbitration briefs that

6      were filed way back when with the arbitration panel, and I

7      found where they make that claim.  Mr. Lindell stated he

8      would show PCAP data to the cyber experts.  This is on page

9      13 of their post hearing brief.

10           And I went to the transcript page that's cited,

11     and what do you know.  It's just saying this is what

12     Mr. Zeidman understood.  There is no reference to any

13     testimony by Mike Lindell.  It also references

14     Mr. Zeidman's report.

15           I went there.  There is nothing there, either.

16     That just simply does not exist, and I'll tell you what.

17     We quoted the language in our beefs.  The panel

18     specifically said it has to be PCAPs.  At the end of that

19     long analysis, they said it has to be PCAPs.

20           So with all respect, counsel is wrong about that.

21     That is exactly how they made their decision.  I will leave

22     it at that.

23           Thank you.

24           THE COURT:  Thank you, Counsel, for your

25     arguments today.  Excellent.  I appreciated hearing from

1   both of you.

2          The Court will take the motions under advisement

3   and will issue a written order as quickly as possible.

4          Thank you.

5          MR. BECK:  Thank you.

6          THE COURT:  Thank you.

7          THE CLERK:  All rise.

8          THE COURT:  Thank you for coming, Mr. Zeidman.

9                    **(Court was adjourned.)**

10                  *        *        *

11          I, Kristine Mousseau, certify that the foregoing

12   is a correct transcript from the record of proceedings in

13   the above-entitled matter.

14

15

16

17      Certified by:  s/  *Kristine Mousseau, CRR-RPR*
                        Kristine Mousseau, CRR-RPR
18

19

20

21

22

23

24

25